**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EXECUTIVE WINGS, INC.,        )
                                        )
                Plaintiff,     )
                                          )     Civil Action No. 2:13-cv-00523
v.                                 )
                                         )     U.S. District Judge Mark R. Hornak
ROBERT DOLBY and AVIATION     )
ADVISORS INT'L, INC.,         )
                                         )
                Defendants.   )

## OPINION

**Mark R. Hornak, United States District Judge**

At the heart of this dispute is the amount of money the Plaintiff, Executive Wings, Inc. ("EWI") paid (and was supposed to pay) to have the Defendants, Aviation Advisors Int'l, Inc. ("Aviation")[1] and its president, Robert Dolby ("Dolby"), help EWI acquire a multi-million dollar corporate jet. According to EWI, the parties agreed on a commission or fee payable to Aviation of sixty thousand dollars ($60,000) for its services involved in the purchase of the jet. But, EWI contends, Dolby and Aviation cheated it by taking a hidden "extra" profit from the jet sale that they put together for EWI, one contrary to their express understanding. Further, EWI says it was then deprived of the benefit of its bargain when it did not get the high end warranty on the jet's engines that it says it was promised.

After removing this action to federal court, the Defendants moved to dismiss it, arguing that this Court lacks personal jurisdiction over the Defendants, that venue here is improper, and that at least as to part of the Complaint, EWI has failed to state a claim upon which relief can be granted. The Court heard oral argument on the Motion. Following that argument, the Court

---

[1] Incorrectly identified as "Aviation Advisors, Int'l, Inc." by the Plaintiff. ECF No. 6, at 1.

concluded that because this is a pure business dispute between sophisticated parties, it was proper to swiftly divert the parties into the Court's Alternative Dispute Resolution program ("ADR"). The Court's hope, proven to be unfulfilled, was that with the assistance of counsel, the parties (large enough and savvy enough to live in the world of private jets) would resolve their dispute between them, as business people often do. Those hopes soon devolved into hostile finger pointing between the principals of the corporate parties and their lawyers, in that the two ADR sessions held in this case were not only fruitless, but led to dueling ADR sanctions motions.

The Court will now clear the decks by ruling on all pending Motions, and ordering Defendant to file an Answer to Plaintiff's Complaint. For the reasons set forth in this Opinion, the Court will grant in part and deny in part the Defendants' Motion to Dismiss[2] (ECF No. 6); deny all Motions for Sanctions, however styled (ECF Nos. 29, 32, and 40); and deny EWI's Motion for a Status Conference (ECF No. 43).

## I.    <u>BACKGROUND</u>

The basic facts of the case as set out in the Complaint, which at this point the Court must accept as true, are as follows. EWI is a Delaware corporation with its principal place of business in Allegheny County, Pennsylvania and is "in the business of owning and operating an aircraft." ECF No. 1-2, at ¶¶ 1, 5. It is run by Mr. Frank Zokaites ("Zokaites"), who is a resident of this District. ECF No. 24, at 2. Aviation is a Florida corporation doing business from Florida. ECF No. 1-2 at ¶ 3. Mr. Robert Dolby is the CEO of Aviation, *see* ECF No. 24, at 2, and a resident of Florida, ECF No. 1-2, at ¶ 2. EWI was in the market for a late model used jet airplane, and received targeted email solicitations from Aviation about its services in such regards. *Id.* ¶ 5;

---

[2] The Court will deny the Defendants' Motion to Dismiss for Lack of Jurisdiction but grant the Motion to Dismiss pursuant to Rule 12(b)(6) as to EWI's fraud and breach of fiduciary duty claims.

ECF No. 15-1, at 10-14. EWI called Aviation and was informed that Aviation was in the business of finding planes and acting as a broker for those interested in purchasing them. ECF No. 1-2 at ¶ 5.

During the initial contacts with Aviation, EWI stated that it wanted to purchase a late model used jet airplane with low engine hours with a price not to exceed $2.4 million. *Id.* ¶ 6. The parties came to an agreement whereby Aviation would find a plane for EWI and would act as their broker in the transaction for a brokerage commission of $60,000. *Id.* ¶ 8. Dolby acted as broker and agent for EWI. *Id.* ¶ 9.[3] From October to December 2012, Dolby presented several airplanes for EWI's consideration, and in December 2012 Aviation found a plane ("Premier Airplane") that it thought fit the bill. It was located in Berlin, Germany. *Id.* ¶¶ 10-11. The Premier Airplane was advertised as coming with a fully paid Total Assurance Elite Program engine warranty from Williams International, LLC ("TAP Elite warranty"). *Id.* ¶ 11. The Premier Airplane was owned by Bank of Utah as trustee for Sinai Air, LLC ("Sinai Air"), an Egyptian company. *Id.*

Aviation told EWI that the purchase price to EWI for the Premier Airplane was $2,425,000, a price that included the agreed upon commission or fee of $60,000. EWI paid a $50,000 deposit and then entered into a contract with Aviation.[4] *Id.* ¶¶ 12-15. Under the bilateral contract, Aviation was the seller (even though Sinai Air actually owned the airplane) and EWI was the buyer. *Id.* ¶ 16. EWI asked Aviation how it intended to sell a plane it did not own, to which Aviation responded that it had entered into a separate contract with Sinai Air. *Id.* ¶ 17. EWI suspected that Aviation might be making a markup on the plane in addition to the brokerage

---

[3] Dolby and Aviation deny that they had this status. ECF No. 8 at 3, ¶ 22.

[4] The jet was inspected during this period, and this inspection was conducted by Alf Kuenzl ("Kuenzl"), an associate of Aviation. ECF No. 1-2, at ¶ 13.

fee of $60,000, so EWI demanded a copy of the contract between Aviation and Sinai Air.[5]  *Id.*

¶ 18.  EWI says that Aviation delayed in providing the contract between Aviation and Sinai Air.

*Id.*  EWI also told Aviation that it wanted to contract directly with Sinai Air without the need for

Aviation as middleman.  *Id.* ¶ 19.  The written contract between Aviation and EWI contained the

purchase price of $2,425,000 and stated that the TAP Elite engine warranty would be paid up and

transferred at closing.  *Id.* ¶ 20.  EWI kept asking to see the Sinai Air contract, and Aviation

refused to send it over.  According to EWI, Aviation offered "irrelevant and frivolous reasons"

for the arrangement in place and "also represented that there was no additional markup and that

all EWI would be paying was the true purchase price for the airplane plus the $60,000

commission."  *Id.* ¶ 19.  That said, it also appears from EWI's own pleadings that it went ahead

with the purchase anyway, at the $2,425,000 price.  *Id.* ¶ 30.

But the plot thickened.

According to EWI, Aviation accidentally forwarded to EWI an email from someone (not

named in the Complaint) at Aviation that stated the following:

> Guys-I don't like this but he has been pushing this [obtaining a copy of the true
> purchase agreement] for weeks. Obviously, I will blank out the price if I do that,
> but I prefer not to provide it. Any ideas, confidentiality, etc that you can raise?

*Id.* ¶ 22.  From this, EWI concludes, "[t]his email obviously shows an underhanded

scheme to make an additional profit on the Premier Airplane beyond the agreed upon

$60,000 . . . ."  *Id.* ¶ 23.  On January 22, 2013, Aviation did send the contract between

Aviation and Sinai Air over to EWI with the price redacted in one place but not redacted

---

[5] This appears to be the factual nub of a large part of this lawsuit.  EWI, though willing to pay the purchase price of $2,425,000 for the airplane (which is the amount it actually paid), says that it was unwilling to agree to a situation in which Aviation would make more than $60,000 on the deal.  There is nothing in the Complaint to suggest that EWI thought that $2,425,000 was an unfair or incorrect price, or was too high in any normative sense, and they did pay it to get the jet.  It is also not alleged that the deal was to be a true "cost plus" arrangement, whereby EWI would pay the precise acquisition cost of the jet from Sinai Air (whatever it turned out to be), plus a fixed kicker of $60,000 to Aviation, in which case the size of the actual payment to Sinai Air would directly determine the final contractual price paid by EWI to Aviation.

in another place. The purchase price from Sinai Air was listed at $2,300,000. *Id.* ¶ 24.

Mr. Zokaites sent an email to Aviation and Mr. Kuenzl (the German airplane inspector)

the next day stating that he (Zokaites) was terminating the transaction. *Id.* ¶ 25.

Then, in another twist, Mr. Kuenzl allegedly wrote the following email intended for

Mr. Dolby on the subject of EWI's attempt to terminate the agreement, but he accidentally sent it

to EWI instead:

> Bob, pls call me to discuss.
>
> Should I tell him the truth that TAS [Kuenzl's company] had the initially [sic] aircraft and offered to you for $2,360,000 plus 5000 inspection/handling cost (2 trips to Berlin etc) and TAS is getting also 60,000 on top with a discrete dub-commission payable to Wolfgang who gave me a tip, so you consequently offered it to Frank [Zokaites] in good faith and trust for $2,425,000…Or what story do we sell him[?]
>
> Alf

*Id.*

Based on these allegations, EWI claims that Aviation and Mr. Kuenzl "conspired together

to give the appearance to EWI [that] they were working on his behalf but yet intended to make a

profit beyond the agreed upon $60,000 commission by becoming a middle man, straw purchaser

and re-selling a plane to EWI." *Id.* ¶ 26. EWI alleges that Aviation was making a "secret profit"

on the airplane. *Id.* ¶ 27.[6] Before closing, EWI said it would not pay more than $60,000 in

commission, to which Aviation responded that EWI would lose its $50,000 deposit and be sued

by all parties involved if it did not close on the deal. *Id.* ¶ 28. EWI relented and told Dolby it

would go through with the deal but that it would do so under protest. *Id.*

The closing occurred on January 28, 2013. At the closing, Aviation first purchased the

airplane from Sinai Air despite not having the funds to purchase it. *Id.* ¶ 29. The Complaint

---

[6] Given the mash up of misdirected emails and faulty redactions, the Court is hard-pressed to conclude that at this point, anything about an alleged additional profit remained secret.

then says that Aviation "sold the airplane to EWI and used EWI's money to pay Sinai Air." *Id.* On February 1, 2013, EWI received the settlement statement that listed a purchase price of $2,425,000, with a fee to Aviation of $125,000. *Id.* ¶ 30. Thus, EWI's first complaint is not that it paid more in total for the airplane than it initially agreed to pay, or more than it was willing to pay,[7] but rather that Aviation received out of the deal just about double what they said they would get.

The second basis for EWI's claim relates to the jet engine warranty. According to the Complaint, Aviation provided a TAP Elite "Progressive" warranty instead of the TAP "Elite" warranty that they had agreed upon. *Id.* ¶ 33–34, 36. To upgrade to the better warranty would cost EWI $108,783. *Id.* ¶ 35.

EWI has alleged claims for (1) Breach of Fiduciary Duty (ECF No. 1-2, ¶¶ 39–47); (2) Fraud (*Id.* ¶¶ 48–59); and Breach of Contract (*Id.* ¶¶ 60–65). EWI seeks damages of $125,000 in wrongful profits and unearned commission[8] along with $108,783 for the cost of upgrading to the TAP Elite warranty. *Id.* ¶¶ 45–47, 57–58, 65.

## II.  STANDARD OF REVIEW

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits a court to dismiss a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Once a challenge to personal jurisdiction has been fairly raised, the plaintiff has the burden of establishing "jurisdictional facts through sworn affidavits or other competent evidence." *Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990) (citation omitted). Specifically, the plaintiff carries the burden of proving "either that the cause of action arose from the defendant's forum-related activities

---

[7] It never alleges that either state of affairs is the case.

[8] It seems that this demand equals 100% of Aviation's total cash from the deal. In this regard, without explanation, EWI appears to also want a refund of the $60,000 that it says it agreed all along that Aviation should be paid.

(specific jurisdiction) or that the defendant has 'continuous and systematic' contacts with the forum state (general jurisdiction)." *Mellon Bank (East) PSFS, N.A. v. DiVeronica Bros., Inc.*, 983 F.2d 551, 554 (3d Cir. 1993) (citations omitted). In reviewing a motion to dismiss for lack of personal jurisdiction, the Court must accept as true all allegations in the complaint. *See D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Marten v. Godwin*, 499 F.3d 290, 295–96 (3d Cir. 2007).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, a motion to dismiss should be granted if a party does not allege facts which could, if established at trial, entitle him to relief. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III.   <u>DISCUSSION</u>

### A.   **Does the Court have Personal Jurisdiction over the Defendants?**

The Defendants say that this Court does not have personal jurisdiction over them because EWI has failed to establish that the Defendants had the requisite minimum contacts with Pennsylvania, that the Defendants purposefully availed themselves of Pennsylvania and its laws, or that haling the Defendants into court in Pennsylvania would comport with traditional notions of fair play and substantial justice. ECF No. 7, at 10. Thus, they say, EWI has failed to demonstrate that this Court has specific personal jurisdiction over them. *Id.*

EWI disagrees. It says that while the Defendants may not have ever physically entered Pennsylvania, the Defendants had a long string of intentional contacts with Pennsylvania through

the use of cell phones, emails, and the Internet, as well as the exchange of contractual documents and bank wire transfers.  ECF No. 15, at 9.  These contacts, says EWI, were sufficient to confer specific jurisdiction over the Defendants.  *Id.*

EWI is right.  As this Court recently explained, "personal jurisdiction issues are more complicated when a defendant's contact with the forum state is primarily done through internet contacts."  *R.Q.C. Ltd. v. JKM Enterprises, Inc.*, No. 13-307, 2014 WL 4792148, at *3 (W.D. Pa. Sept. 23, 2014) (internal quotation marks omitted).  In *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997), the court established a "sliding scale" analytical framework for internet-based personal jurisdiction cases based upon the "level of interactivity and commercial nature of the exchange of information that occurs on the Web site." The court explained:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* (internal citations omitted).

Our Court of Appeals endorsed this general framework in *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446 (3d Cir. 2003), but explained that mere Internet presence is insufficient to

establish personal jurisdiction. Rather, Internet presence must be coupled with something else that demonstrates purposeful availment:

> As *Zippo* and the Courts of Appeals decisions indicate, the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant "purposefully availed" itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts.

*Id.* at 454.

In this case, the parties have presented a detailed documentary record that reveals that this whole saga had its genesis in three unsolicited emails from Aviation to EWI's top executive, Frank Zokaites, which provided information about the market for private jets and invited EWI to contact Aviation if it could be of assistance to EWI in such regards. ECF No. 15-1, at ¶¶ 5–6, 10–14. EWI did just that. That was later followed by many emails between the parties, and then phone calls, mail, and personal meetings and contacts that led to the deal at issue here. *See id.* ¶¶ 20–29.

The Court concludes from the record before it that specific personal jurisdiction over the Defendants does exist. As this Court explained in *R.Q.C.*, where, as here, a defendant uses its interactive, commercial website/Internet capabilities to specifically initiate and then engage in business transactions with a plaintiff in the forum state, personal jurisdiction consistent with the Constitution and Pennsylvania's "long arm" statute exists. *See R.Q.C. 2014 WL 4792148, at *4*. Here, the record reveals that in regard to the deal between the parties, the ball got rolling when the Defendants reached out to Mr. Zokaites via email, specifically addressed to Mr. Zokaites, and offered Aviation's services in jet airplane acquisition. As EWI points out, the initial contact between the parties here began when Dolby sent three unsolicited emails to Mr. Zokaites on July 12, 2011, October 10, 2011, and January 5, 2012. ECF No. 15-1, at ¶¶ 5-7. The purpose of the

emails was the solicitation of jet airplane business, and the emails contained the web address for Aviation. *Id.* Before receiving these emails, Mr. Zokaites had never heard of Aviation. *Id.* ¶ 8.

The record reveals that the Defendants specifically intended to have just such an interaction with the Plaintiff, a resident of the forum state, and purposely availed themselves of its jurisdiction. The Defendants set out to do business with the Plaintiff, completed the business relationship with the Plaintiff, and did so in a way that purposely availed themselves of the opportunity and goal of establishing that business relationship in and with this State. *See Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). The record also reveals that the deal was done principally via the Internet and involved the "knowing and repeated" transmission of files over the Internet. *See*, *e.g.*, ECF No. 15-1 at 21-29. The record sufficiently demonstrates that the Defendants purposely availed themselves of the jurisdiction of this state by conducting that focused business activity in and with this state, that this lawsuit arises directly out of and relates to those activities, and that the exercise of specific personal jurisdiction over the Defendants comports with "fair play and substantial justice." *See O'Conner v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). The Motion to Dismiss for lack of personal jurisdiction is denied.

### B.     Is Venue Here Proper?

The Defendants next urge this Court to dismiss this action for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), arguing that the Complaint is "void of factual allegations to establish that venue is proper in the Western District of Pennsylvania." ECF No. 7, at 10. As such, say the Defendants, the Court should dismiss the action. EWI counters that venue here is proper because this is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of

the action is situated." 28 U.S.C. § 1391(b)(2). EWI is correct that the case is properly in this Court, but principally for a different reason.

Under Rule 12(b)(3), the "defendants bear the burden of showing improper venue." *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x 157, 160 (3d Cir. 2012) (quoting *Myers v. Am. Dental Ass'n,* 695 F.2d 716, 724–25 (3d Cir. 1982)) (alterations omitted). Under 28 U.S.C. § 1391(b), a civil action may be brought in

> **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> **(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> **(3)** if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

But § 1391 does not apply in every case. "For actions removed from state court . . . venue is governed by 28 U.S.C. § 1441(a), which requires that such actions be removed to 'the district court of the United States for the district and division embracing the place where the state court action is pending.'" *Reassure Am. Life Ins. Co. v. Midwest Res., Ltd.*, 721 F. Supp. 2d 346, 351 (E.D. Pa. 2010) (citing *Polizzi v. Cowles Magazines, Inc.,* 345 U.S. 663, 665– 66 (1953)); *see also Heft v. AAI Corp.*, 355 F. Supp. 2d 757, 772 (M.D. Pa. 2005) ("Once a defendant files a notice of removal, the propriety of venue is determined by reference to § 1441(a)."); *Dapuzzo v. Anderson*, No. 14-6107, 2015 WL 1268317, at *2 (D.N.J. Mar. 18, 2015) (explaining that "§ 1391 does not apply to actions removed to federal court" and that

venue is proper when the case has been removed to the proper "district and division" as defined by § 1441(a)).[9]

The parties here centered their venue arguments on 28 U.S.C. § 1391, much as the parties did in *Reassure*. But there, the court explained:

> Both parties assume in their briefing that venue in this action is governed by 28 U.S.C. § 1391, which dictates where civil diversity actions may be "brought." The Supreme Court has noted, however, that § 1391 applies only to actions initially brought in federal court, not to actions such as this one that are initially filed in state court and subsequently removed to federal court. *Polizzi,* 345 U.S. at 665, 73 S.Ct. 900. Venue for removal actions is governed by 28 U.S.C. § 1441(a), which requires that such actions be removed to "the district court of the United States for the district and division embracing the place where [the state court] action is pending." *See Polizzi,* 345 U.S. at 666, 73 S.Ct. 900. Plaintiff initially filed this action in the Montgomery County Court of Common Pleas, which is located within the Eastern District of Pennsylvania. As a result, venue is proper in this district.

*Reassure*, 721 F. Supp. 2d at 358. EWI filed this action in the Court of Common Pleas of Allegheny County, Pennsylvania, ECF No. 1, at ¶ 1, which is located in the Western District of Pennsylvania, and the Defendants removed it here. Venue is proper in this district by virtue of § 1441(a).

Even if § 1391 did apply, venue would still be proper in this district because "a substantial part of the events or omissions giving rise to the claim occurred" in this district. 28 U.S.C. § 1391(b)(2). "[I]n determining whether a substantial part of the events or omissions giving rise to a cause of action occurred in a specific jurisdiction, 'the test is not the defendant's contacts with a particular district, but rather the location of those events or omissions giving rise

---

[9] This is not to say that an action may not be transferred to another venue after removal. "Indeed, the federal transfer statute, 28 U.S.C. § 1404(a), plainly contemplates this situation. It provides that a court in which venue is proper may nevertheless 'transfer any civil action to any other district or division *where it might have been brought.*'" *Heft*, 355 F. Supp. 2d at 772 (quoting 28 U.S.C. § 1404(a)). Here, however, the Defendants have sought dismissal on the basis that venue is improper. Furthermore, given the facts of this case, the Court concludes that § 1404(a) and the factors set forth in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995), do not facially counsel in favor of transferring this action to any other district, and the Defendants have never asserted that they do.

to the claim.'" *Bockman*, 459 App'x at 161 (quoting *Cottman Transmission Systems, Inc. v. Martino* 36 F.3d 291, 294 (3d Cir. 1994)) (alterations omitted). Furthermore:

> in assessing whether events or omissions giving rise to the plaintiff's claims are substantial, it is necessary to look at the nature of the dispute. Moreover, we observed that the venue provision favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be substantial, and that substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute.

*Id.* (internal quotation marks, citations, and alterations omitted).

The facts of this case satisfy § 1391(b)(2). This is not a remote district having no real relationship to the parties' dispute. Rather, Mr. Zokaites signed the contract in Pennsylvania, based on drafts sent by the Defendants into Pennsylvania, and the plane was paid for with funds sent by wire to the Defendants from Pennsylvania and the Defendants knew that it would end up here. A substantial portion of the events and transactions upon which the claims occurred in Pennsylvania.[10] For all of these reasons, the Motion to Dismiss for improper venue is denied.

### C. Should EWI's Claims for Fraud and Breach of Fiduciary Duty be Dismissed?

Using Federal Rule of Civil Procedure 12(b)(6), the Defendants move to dismiss EWI's claims for Fraud and Breach of Fiduciary Duty on the basis that they are barred by either the economic loss doctrine or the gist of the action doctrine.[11] The Court concludes both counts should be dismissed on the basis of either doctrine.

---

[10] Furthermore, the Court has already concluded that Aviation is subject to this Court's personal jurisdiction. As explained in the following section of this Opinion, Aviation is the only remaining Defendant in this action. Mr. Dolby is out. Under 28 U.S.C. § 1391(b)(1), venue is proper in "a judicial district in which any defendant resides," and for venue purposes an entity such as Aviation "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question," 28 U.S.C. § 1391(c)(2). *See, e.g., Quinn v. Worldwide Commc'ns, Inc.*, No. 10-1512, 2011 WL 673748, at *5 (E.D. Pa. Feb. 16, 2011) ("[I]t is clear that venue is proper in this District where this Court has determined that Defendants are subject to personal jurisdiction."). Therefore, if § 1391 applied here, this would be yet another basis for denying the Motion to Dismiss for improper venue.

[11] The Defendants specifically argue that the economic loss doctrine bars both the fraud and the breach of fiduciary duty claims and that the gist of the action doctrine bars the breach of fiduciary duty claim. Courts have noted the

The Complaint alleges an express agreement of the parties that EWI would pay Aviation a $60,000 commission for its services, and no more. EWI pleads that by arranging the format of the deal as it did, the Defendant captured and then concealed (at least at first) from EWI the fact that Aviation made a lot more money from doing the deal, namely by way of a profit on the buy/sell of the jet airplane from Sinai Air along with a payment to it under the EWI/Aviation contract. If that is a claim at all, it is a claim arising from and under an agreement between EWI and Aviation, and such an agreement alone.

As the Pennsylvania Supreme Court recently noted, when and where the claim asserted demonstrates that the duty allegedly breached is one created by the parties in their contract, that is to say, from a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract, then the claim, no matter how styled, is one for a breach of contract. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014). The *Bruno* Court explained the contours of the gist of the action doctrine as follows:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

---

significant overlap between the two doctrines. *See, e.g., Covertech Fabricating, Inc. v. TVM Bldg. Products, Inc.*, No. 13-150, 2014 WL 2605427, at *5 (W.D. Pa. June 11, 2014) ("Both doctrines share the common purpose of 'maintaining the separate spheres of the law of contract and tort.'") (quoting *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989)). In any case, the Court believes that both claims would be barred by either doctrine and will evaluate both of them under each standard.

*Id.* (internal citation and footnote omitted); *see also Certainteed Ceilings Corp. v. Aiken*, No. 14-3925, 2015 WL 410029, at *9 (E.D. Pa. Jan. 29, 2015) (explaining that "claims for breach of fiduciary duty are not barred if the fiduciary duty at issue goes beyond the particular obligations contained in the parties' contract," while "breach of fiduciary duty claims are barred by the gist of the action doctrine if there are no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside of the parties' contractual agreements") (internal quotation marks omitted).

Applying that governing principle, all of EWI's claims as to the alleged excess commission or fee sound in contract, not in tort. The guts of these claims is that the parties agreed to one level of compensation/reward payable to the Defendants for their services, and the Defendants then took a bigger one, one that was contrary to the specific agreement of the parties. The fact that the EWI claims that the Defendants were allegedly sneaky and/or dishonest about how they pulled that off is not the point. What matters is that the obligation to pay any amount (and what that amount was) has its genesis not in some broader social obligations (making it a "tort" duty) but only in the contractual promises of the parties. If Aviation snookered EWI in those regards, EWI's remedy sounds in contract.

EWI's Complaint itself demonstrates that the heart of Aviation's alleged duty to take a $60,000 commission (and no more) is purely contractual. For instance, it says, "EWI agreed to allow Advisors to search for other airplanes and Advisors agreed to act as EWI's broker to locate such an airplane and further agreed to a brokerage commission of $60,000" and that "EWI agreed to the arrangement and to the $60,000 commission." ECF No. 1-2, at ¶ 8. Elsewhere in the Complaint, EWI alleges that Aviation "represented that there was no additional markup and that all EWI would be paying was the true purchase price for the airplane plus the $60,000

commission." *Id.* ¶ 19.  The Complaint also avers that Aviation engaged in an "underhanded scheme to make an additional profit on the Premier Airplane beyond *the agreed upon $60,000 . . . .*" *Id.* ¶ 23 (emphasis supplied). The Complaint is rife with references to the fact that Aviation made more than the "agreed upon $60,000 commission."  *See id.* ¶¶ 8, 12, 18–19, 26–28.  The breach of fiduciary duty claim is therefore merely a breach of contract claim dressed in other clothes.[12]  It is therefore barred by the gist of the action doctrine and will be dismissed.

The same goes for the fraud count.  The alleged fraud relates entirely to the contractual agreement between the parties.  *See, e.g.*, *Paramount Fin. Commc'ns, Inc. v. Broadridge Investor Commc'n Solutions, Inc.*, No. 15-405, 2015 WL 4093932, at *3 (E.D. Pa. July 7, 2015) (holding that the fraud in that case was "properly considered as fraud relating to the performance of the contract" and therefore "barred under the gist of the action doctrine") (internal quotation marks and citations omitted).  The gist of the action doctrine therefore also bars the fraud count here.

Both counts could just as easily be dismissed under the economic loss doctrine.  Under Pennsylvania law, "[t]he Economic Loss Doctrine provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 175 (3d Cir. 2008) (quoting *Adams v. Copper Beach Townhome Comtys., L.P.,* 816 A.2d 301, 305 (Pa. Super. Ct. 2003)); *see also Excavation Technologies, Inc. v. Columbia Gas Co. of Pa.*, 985

---

[12] In the Breach of Contract section (Count III) of the Complaint, EWI did not demand disgorgement of the "wrongful profits and unearned commissions" as it did under the other two Counts.  Rather, the breach of contract Count demands only that Aviation pay the cost to upgrade the TAP Elite progressive engine warranty to a TAP Elite engine warrant.  ECF No. 1-2, at ¶ 65.  On this basis, EWI argues that the gist of the action doctrine does not apply. *See* ECF No. 15, at 19.  But it is irrelevant that EWI failed to assert a breach of contract claim that Aviation breached its alleged agreement to take a commission of only $60,000.  The gist of the action doctrine applies in these facts regardless of whether EWI has labelled its claim as a breach of contract or not, or has asserted it or not.  There can be no obligation for a party to charge $60,000 (and no more than $60,000) for jet airplane brokerage services outside of some agreement of the parties—e.g., there is no "societal" obligation to charge only a "reasonable" fee for such services, and that here, that fee is $60,000 and no more.  If Plaintiff has a claim that Aviation double-crossed it (or otherwise overcharged it), it has its genesis in an agreement between them.

A.2d 840, 841 n.3 (Pa. 2009). More broadly, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir. 1995).

As this Court has explained in the past, "[w]hile the Pennsylvania Supreme Court has not yet addressed whether the economic loss doctrine applies to claims for intentional fraud, the Third Circuit has held that the economic loss doctrine applies to claims for negligence, negligent misrepresentation, and intentional fraud." *Stillwagon v. Innsbrook Golf & Marina, LLC,* No. 11-1338, 2013 WL 1180312, at *11, n.22 (W.D. Pa. Mar. 20, 2013) (citing *Werwinski v. Ford Motor Co.,* 286 F.3d 661 (3d Cir. 2002)). EWI's claims in this case sound solely in contract. The counts alleging fraud and breach of fiduciary duty are therefore barred by the economic loss doctrine[13] in addition to being barred by the gist of the action doctrine.

The Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is therefore granted as to the claims for fraud and breach of fiduciary duty.[14]

### D.     The Sanctions Motions

The Court heard oral argument on the Motion to Dismiss. Based on that oral argument, the Court concluded that this is essentially a $230,000 business dispute between sophisticated parties involving a $2.4 million private jet deal and that they would therefore benefit from fast participation in the Court's standard ADR Program. The Court ordered the parties to schedule a

---

[13] In *Brand Mktg. Group, LLC v. Intertek Testing Servs., N.A. Inc.*, No. 14-3010, 2015 WL 5255078 (3d Cir. Sept. 10, 2015), our Court of Appeals explored the contours of this doctrine and the *"Bilt-Rite"* exception to it, *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270 (Pa. 2005). Whether or not that exception to the application of the economic loss doctrine would be applicable in these circumstances (neither party addressed it), the *Brand Marketing* Court was also quite clear that "benefit of the bargain" damages are not available even if it is. Those are exactly the damages sought here as to the excess fee claim. 2015 WL 5255078 at *7.

[14] That leaves only EWI's breach of contract claim against Aviation in the case. Furthermore, the Plaintiff conceded that Mr. Dolby is not a proper defendant under that existing Breach of Contract Count. *See* ECF No. 15, at 19. Mr. Dolby is therefore out of the case, leaving Aviation as the sole Defendant in a one-count breach of contract action.

mediation session by August 19, 2013. A mediation then took place on September 17, 2013, but the case was not resolved. ECF No. 26. The Court later learned that Mr. Zokaites, president of EWI and the principle actor on the Plaintiff's side in the events of this lawsuit, decided that he would not show up to this first mediation, and did not. Instead, he sent a colleague, Jeff Robinson, who identified himself as a "Vice-President of Zokaites Properties," and who appeared at the first mediation in place of Mr. Zokaites himself. ECF No. 29, at ¶ 29. According to Aviation, Mr. Robinson had no background in the events of the case and had never communicated in any way with Dolby or Aviation and was therefore unqualified to participate in the mediation on behalf of Zokaites. *Id.* ¶¶ 30–32. By the same token, the Defendants were not blameless as to participation in the first mediation: Mr. Dolby, then a Defendant in this action and the CEO of Aviation, the other Defendant, left the mediation early (about four hours into it) due to his self-imposed travel restrictions.[15]

The parties informed the Court of these issues during a telephone conference on October 1, 2013, and the Court entered a Memorandum Order on November 4, 2013, directing the parties to engage in a "do over" of the mediation, concluding that such a remedy would precisely address the behavior of the parties' principals, would honor this Court's ADR Program goals, and might actually assist the parties in resolving their dispute. ECF No. 28. *See Bozic v. City of Washington*, 912 F. Supp. 2d 257, 273 n.14 (W.D. Pa. 2012) (remedy should be precisely tailored to fit the harm).[16]

---

[15] The Defendants claim that Mr. Dolby's early departure was cleared with EWI in advance and was necessary due to his problems scheduling a return flight to Florida, and which he says was all OK with the mediator. But more to the point, he never got clearance from the Court about any of that, as is required by the Court's ADR policy at § 2.7(D). *See* ECF No. 29, at ¶¶ 14–18, 20, 44–47.

[16] The Court determined then, as it determines now, that the best course is for it to resolve these sanctions issues itself. ADR Policy § 2.4.

That was not, however, the end of the matter. Apparently still upset with the events of the first mediation, the Defendants doubled down and filed a Motion for Clarification, ECF No. 29, which was actually a Motion for Sanctions. The Court deferred ruling on that Motion and ordered EWI to respond to it, which EWI did by submitting a letter from Mr. Zokaites, which stated, "I was not made aware that my personal attendance was required by [the Court's] Order."[17] ECF No. 31-1, at 2. Undeterred, the Defendants then filed a Supplemental Motion for Sanctions, ECF No. 32, reiterating their position, clarifying the allocation of the monetary amounts they seek as sanctions, and responding to Mr. Zokaites's letter. Thereafter, the Court convened a status conference involving Messrs. Zokaites and Dolby. ECF No. 34. The Court concluded that given the mutual mediation misbehavior as to the attendance of Messrs. Zokaites and Dolby at the first mediation, the right course still was to call offsetting penalties and send the parties and their principals to another mediation session to be concluded by December 19, 2013.[18]

There were then some delays in getting that ADR session scheduled, but the parties eventually agreed on March 18, 2014 as the date for it to occur. The day before the mediation (March 17, 2014), however, Mr. Dolby allegedly realized he had purchased an airline ticket for the wrong day—that is, he bought a plane ticket from Florida for later in the day on March 18, thinking that the mediation was on March 19—and was thus unable to get to Pittsburgh in time. The parties and the mediator conferred and found that the next possible date for mediation was

---

[17] Despite the fact that the parties' ADR Stipulation, ECF No. 24, and the Court's Order approving that Stipulation, ECF No. 25, both state that Mr. Zokaites would personally attend the mediation, *id.* at 2. As will be seen, given the Court's imposition of offsetting mediation penalties, the Court elected not to make the now-classic inquiry of "what did Mr. Zokaites know, and when did he know it?" That said, no matter how you cut it, Mr. Zokaites acted contrary to this Court's ADR Order, and its ADR Policy, § 2.7(D).

[18] With the mediator now being a retired Chief United States District Judge.

April 15, 2014.  Defendants then filed a Motion to Modify the Mediation Date, ECF No. 37, which the Court promptly granted, ECF No. 38.  So far, so good (or so it seemed).

The case was not resolved at a mediation held on April 15, 2014.  Soon after that, EWI filed its own Motion for Sanctions alleging (1) that the Defendants had made false representations to the Court with regard to the reasons for the cancellation of the March 18 mediation, and (2) that the Defendants exhibited bad faith at the eventual April 15 mediation. The basis for the allegation that the Defendants made false representations to the Court comes down to this: Mr. Dolby said he was unable (on March 17) to schedule a flight that would get him to Pittsburgh early enough on March 18, 2014 when, according to EWI (whose attorney performed a series of Internet searches for flight times and airport drive times which were annexed to EWI's sanctions motion), there were actually plenty of flights that would have delivered Mr. Dolby to Pittsburgh on time, and he easily could have figured that out on March 17.  ECF No. 40, at ¶¶ 8–13.[19]  The basis for the allegation that the Defendants exhibited bad

---

[19] Making at least part of the basis for the Motion the notion that Aviation duped the Court when it asked to bump the mediation date.  Boiled down, EWI says that Mr. Dolby had 46 flights to pick from as of the afternoon of March 17.  Aviation says that they were not "reasonable" flights, as many involved complicated flight changes/really long travel times, and with travel at odd/late hours.  EWI says at least some flights were reasonable, including from surrounding Florida airports.  Aviation says that that really didn't matter, because there was horrible weather in that part of Florida, including a tornado watch, so flying was unpredictable at best.  EWI says that that doesn't matter, because in hindsight, no flights from that part of Florida were actually cancelled.  Aviation says that none of that matters, or was all EWI's fault, because Mr. Zokaites did not show up at the first mediation.  EWI says not so, since the fellow that did show up was a good substitute.  On and on and on.  See ECF Nos. 40, 41, 42.

While the Court recognizes that distinct and important interest in candor to and honesty with the Court, and it may well be that Mr. Zokaites was dismissive of the authority of the Court as to ADR Round One when he didn't show up, and Mr. Dolby was likewise dismissive as to ADR Round Two when he didn't try harder to keep the March 18 date, the Court also believes that it has a reasonably good appreciation for the dynamics underlying the seemingly red-hot litigation of this rather straightforward business dispute.  From the Court's perspective, given that Messrs. Zokaites and Dolby have each now paid their lawyers to file multiple ADR sanctions motions that are in essence dressed up finger pointing, the Court does not believe that it is a wise use of further judicial resources to formally scold two business leaders who should know better.  From where the Court sits, in these circumstances, having them now stew in their own juices is a sufficient consequence for their actions.

faith at the April 15, 2014 mediation appears to be that Aviation offered no money to settle the case.[20] *Id.* ¶ 16.

The Court will deny both parties' Motions for Sanctions. As to the Defendants' Motion related to ADR Round One, the reasons for the Court's decision are set forth fully in its prior Memorandum Order, ECF No. 28. The subsequent filings by the Defendants, ECF Nos. 29 and 32, do not persuade the Court that it made the wrong call the first time around when it called a double foul with offsetting penalties as to "Zokaites v. Dolby – Round One" and ordered a mediation replay. That was the remedy precisely tailored to their conduct and the ensuing harm to the ADR process, and it fit the "necessities of [this] particular case." *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971).

In regard to EWI's Sanctions Motion as to "Zokaites v. Dolby – Round Two," the Court would start by noting that based on its own papers, EWI was not materially prejudiced by the rescheduling of ADR Round Two that took place as a result of Mr. Dolby's allegedly mistaken plane ticket purchase, since, among other things, the parties were able to reschedule the mediation to occur less than a month later, and it did, with the Court's approval.[21]

As to the Defendants' decision to not offer anything to settle the case during Mediation Round Two, the Court does not believe that in this context that is a ground for the imposition of

---

[20] EWI also alleges that the Defendants' own Motion for Sanctions is baseless since it depends on the inference that the case might have been resolved early on if Mr. Zokaites had shown up to the first mediation, an inference that it says is not plausible given Dolby's refusal to offer any money for settlement at the second mediation. ECF No. 40, at ¶¶ 19–21. Rather, EWI says, Mr. Dolby "had no intention to offer one penny to resolve this dispute regardless of who appeared on behalf of EWI," *id.* at ¶ 21, and that the Defendants' Motion for Sanctions "was not filed in good faith but rather was a bald attempt to distract this Court and to paint EWI in a bad light," *id.* at ¶ 23. Suffice it to say that the Court is not at all distracted, and from the Court's perspective, whatever light in which the parties now stand is of their own painting.

[21] True, there may have been some lawyer time involved in the rescheduling, but that strikes the Court as so *de minimis*, and mutual in nature, so as to not merit further discussion.

sanctions.[22]  This is not a situation in which the Defendants sent a representative without the power or authority to meaningfully discuss settlement.  *See Univ. of Pittsburgh v. Varian Medical Sys., Inc.*, No. 07-491, 2008 WL 1774115 (W.D. Pa. Apr. 17, 2008).  Mr. Dolby was plainly just such a person for Aviation.  Further, there is no allegation that Aviation invoked as its position any "standard operating procedure" impeding settlement, *see Grigoryants v. Safety-Kleen, Corp.*, No. 11-267E, 2014 WL 2214272, *7 (W.D. Pa. May 28, 2014).  While there is authority for the proposition that failing to make any settlement offer in a mediation is ADR "bad faith," *Vay v. Huston*, No. 14-769, 2015 WL 791430 at *3 (W.D. Pa. Feb. 25, 2015), the Court concludes that such a principle would not be applicable here.  First, the second ADR proceeding was a "mediation" in format by direction of the Court.  The parties had no choice at that point.  Second, both *Vay* and *Grigoryants* recognize that no party is required to settle a case.  Third, the facts in *Vay* reveal that the "bad faith" there was centered on the plaintiff's failure to fulfill its preparatory obligations under the Court's ADR Policy and Procedures, and by seemingly not objecting early on to a judicial directive that the ADR proceeding start as an "early neutral evaluation" and then transition into a "mediation."  *Vay*, 2015 WL 791430, at *4.

Here, perhaps Aviation can be faulted for not forcefully telling the Court during the above-referenced status conference, which involved the principals, that it viewed this as a "zero offer" case, no matter what.  But, given that ADR Round One was hamstrung by the non-involvement of Mr. Zokaites and the limited availability of Mr. Dolby, and the Court's ongoing recognition that the positions of litigants, even in a mediation, can and often do change once the process is fully engaged with a seasoned ADR neutral (such as was involved here), the

---

[22] That said, given what appear to be the express contractual terms regarding the provision of a TAP Elite warranty which was apparently not delivered by Aviation, the Court will be interested in the Defendant's explanation as to why that warranty was not delivered or otherwise accounted for.  *See* ECF No. 1-2 at 16, 20.

Court almost certainly would have nonetheless directed that ADR Round Two proceed in the hope that with the principals in a room with a veteran former federal judge as the neutral, settlement positions could change. In addition, given that the Court had ordered ADR Round Two as a remedy for the non-participation in ADR Round One, the Court will not now fault Aviation, or its lawyers or representatives, for not speaking up more forcefully in the face of the Court's express directives.

Where, as here, (a) lead counsel for each party appeared at the ADR proceeding, (b) the "right" representatives attended on behalf of each party, (c) there was no non-compliance with the Court's ADR procedural requirements nor (d) the imposition of any "standard" settlement policy impeding any settlement discussion, we are left with two (2) arguments for sanctions. The first is that Aviation trumped up a flimsy "I can't get a new plane ticket" excuse that caused the date of ADR Round Two to be moved. But moved it was, without any material detriment to EWI or the ADR process, so if sanctionable conduct on the part of Aviation or its lawyers occurred in those regards, it is not sanctionable because of *ADR* misbehavior, thus making an ADR sanction for that reason inappropriate. That then leaves the question of sanctions based on what Aviation told EWI and the Court in response to EWI's Sanctions Motion. Given the muddled nature of why Mr. Dolby did not successfully fly to Pittsburgh on March 17, 2014, *see* note 19 *supra*, the Court simply is not in a position to conclude that he or his lawyers misled the Court.[23]

The second basis for ADR sanctions is that EWI was willing to compromise its settlement position, but Aviation was not. On the facts alleged by EWI, and in the context as

---

[23] As intriguing as it might be, the Court's now holding a hearing to flesh out the interrelationship of airline scheduling/driving times/weather forecasts/flight delays in Gulf Coast Florida on March 17, 2014 would be a waste of judicial resources in the context of what was an easily rescheduled ADR Round Two.

noted above, the Court concludes that Aviation's alleged "zero offer" position is not evidence of an objectively unreasonable engagement in the ADR do-over that the Court had ordered. *See Procaps S.A. v. Patheon Inc.,* No. 12-24356, 2015 WL 3539737 at *6-9 (S.D. Fla. June 4, 2015). To hold otherwise, in these circumstances, would be to sanction Aviation for being unwilling to compromise its settlement position or settle the case, which the Court believes would be improvident in the absence of a violation of an Order of this Court, or of an ADR Policy, rule, or norm specifying some "objectively-determinable" ADR conduct which Aviation breached.[24]

The dueling Sanctions Motions will therefore be denied. Further participation in the Court's ADR Program will not be required at this juncture, in light of the parties' repeated, failed efforts in such regards.

### E.    Motion For A Status Conference

Having now addressed all pending Motions in this Opinion, and noting that it will soon conduct an Initial Case Management Conference, the Court concludes that there is no need for a status conference at this point; therefore, EWI's Motion for Status Conference is denied as moot.

## IV.    CONCLUSION

For the reasons set forth in this Opinion, the Court will grant in part and deny in part the Defendants' Motion to Dismiss (ECF No. 6); deny all Motions for Sanctions (ECF Nos. 29, 32, and 40); and deny EWI's Motion for a Status Conference (ECF No. 43). The Defendant shall

---

[24] Perhaps Aviation made no offer because it believes it has no liability, or that for some other reason, it has a sure winner. If so, such beliefs may turn out to be reasonable, or not. *See Arneault v. O'Toole*, No. 11-95, 2014 WL 1117900 (W.D. Pa. Mar. 20, 2014) (sanctions awarded when party made no monetary settlement offer when liability had been found against it). Or, there may be more sinister reasons for no settlement offer -- anger at EWI or Mr. Zokaites for suing, or even dismay with being ordered to a Second ADR proceeding by the Court. Or, maybe Mr. Dolby is simply stubborn in such regards. Figuring out whether Aviation's position was based on its litigation risk assessment, or less laudable or logical reasons, would require substantial inquiry by discovery or otherwise into the basis for, and the underlying reasonableness of, the substantive merits of its ADR position. That would then create a second, collateral litigation over those issues for which a cloak of confidentiality would otherwise apply. While there may be cases in which doing so is necessary and proper in order to vindicate the important principles and efficacy of this Court's ADR Program, for the reasons articulated by the *Procaps* Court, this Court believes that process should occur, if at all, only in more compelling circumstances than those present here.

file an Answer on or before October 15, 2015.  The parties shall file their Rule 26(f) Report on or before October 29, 2015.  A Case Management Conference will then follow.

An appropriate order will be entered.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated:  September 16, 2015

cc:  All counsel of record